UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at COVINGTON

CIVIL ACTION NO. 09-158-GWU

RONDA L. LEAKE, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Disability Insurance Benefits (DIB). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1.  Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2.  If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

3.  The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed

1

     in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

  4.  At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

  5.  If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

  Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim.  Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary.  Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.  20 C.F.R. § 404.1529 (1991).  However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

3

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category

if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. § 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance

on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

**DISCUSSION**

The plaintiff, Ronda L. Leake, was found by an Administrative Law Judge (ALJ) to have a "severe" impairment consisting of degenerative disc disease of the lumbar spine.  (Tr. 16).  Nevertheless, based in part on the testimony of a Vocational Expert (VE) and a Medical Expert (ME), the ALJ determined that Mrs. Leake the residual functional capacity to perform her past relevant work, and therefore was not entitled to benefits.  (Tr. 19-23).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age, education, and work experience could perform any jobs if she were capable of "light" level exertion, with only occasional kneeling and squatting.  (Tr. 503-6).  The VE responded that with these restrictions, the plaintiff could perform her past work as a retail sales clerk, phlebotomist, and IV therapist.  (Tr. 506).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence.  There is an additional issue in that the plaintiff's Date Last Insured (DLI) was December 31, 2005, meaning that she was required to demonstrate disability existing before this date in order to be entitled to benefits.

Mrs. Leake alleged disability due to back problems, poor concentration, and poor memory, resulting from a motor vehicle accident on May 30, 2001.  (Tr. 86). Medical records show that Mrs. Leake was involved in a head-on collision and underwent an open reduction and internal fixation of a right femur fracture.  (Tr. 147).  Mrs. Leake testified that she continued to have problems with back pain, which could last one to two weeks or just a couple of days at a time as of her DLI, which was so severe she could hardly straighten up or walk.  (Tr. 447-8).  She had been scheduled for surgery on her spine, but it had to be canceled because the damage was found to be more extensive than the surgeon originally thought.  (Tr. 449).  As a result, she had been taking the pain medications Morphine and Vicodin. (Tr. 450).  She could do a few household activities but was still unable to stand or walk for more ten minutes.  (Tr. 457).  Even reading became uncomfortable.  She was limited in her daily activities because the medications made her drowsy.  (Tr. 458).  Her husband, Gary Leake, essentially confirmed her testimony, and stated that the only way that she was able to do anything for more than an hour at a time was to use a wheelchair.  (Tr. 462-3).

Dr. Arthur Lorber, the ME, testified at the first of two administrative hearings that Mrs. Leake had a MRI of the lumbar spine in September, 2001 which was unremarkable other than a possible "pars" defect at L5-S1.  (Tr. 372).  Regarding the proposed spinal surgery, Dr. Lorber testified that the plaintiff's physician, Dr.

John M. Roberts, had obtained a discogram in February of 2003 showing multiple levels of degenerative disc disease with no evidence of neural impingement, and contrary to the plaintiff's assertion, the reason surgery "was not performed was not because the disease process was so extensive but rather that it was not localized." (Tr. 472). He explained that Mrs. Leake's complaints of pain at all of the four levels tested meant that the problem could not be pinpointed to a specific level. (Id.). He went on to note that the plaintiff did not meet any of the Commissioner's Listings of Impairment due to the lack of findings of any focal neurological deficits, but that she did have evidence of a "severe" impairment of the lumbar spine. (Tr. 472-3). He felt that Mrs. Leake would be capable of a full range of "light" activities. (Tr. 473).

The plaintiff's treating family physician, Dr. A. Gigi Tcheng, opined that she would be restricted to lifting no more than ten pounds (for 30 minutes of the day total), could stand and walk four hours in an eight-hour day (no more than 30 minutes without interruption) and sit four hours in an eight-hour day (no more than one hour without interruption), could "never" perform any postural activities, and would have restrictions on reaching, pushing, pulling, and on working around heights, moving machinery, temperature extremes and vibration (Tr. 400-1). Asked about this opinion, Dr. Lorber stated that there was no evidence in the record to support such restrictions, that Dr. Tcheng was a general practitioner, and that a one-time consultative examiner, Dr. Martin Fritzhand, had found no abnormalities

9

on examination. (Tr. 474). Dr. Lorber added that "I think we also have to consider the fact that this lady is undoubtedly addicted to prescription narcotics and factor in her complaints on that basis." (Id.). Dr. Roberts, another treating source, stated that the plaintiff had pathology that was so extensive that no type of surgery could address it all and that in his opinion Mrs. Leake would be unable to return to her prior work as an IV technician, although she was capable of working up to perhaps four hours a day with frequent changes of position. Asked about Dr. Roberts's conclusions, Dr. Lorber reiterated that he believed the plaintiff's response to the discogram was invalid and if Dr. Roberts had relied on it he was mistaken. (Tr. 479-80).

After a continuance of several months, Dr. Lorber was questioned further about certain objective studies. He admitted that there was a lumbar MRI from December, 2002 (Tr. 426) showing degenerative changes that could result in lumbar spine pain. (Tr. 495).[1] Asked whether this was objective evidence of a medical condition which could reasonably be expected to cause pain, Dr. Lorber stated that such degenerative changes could be symptomatic or asymptomatic. (Tr. 496). Asked if there was any other evidence that could reasonably be expected to be consistent with complaints of back or leg pain, Dr. Lorber somewhat grudgingly

---

[1] The MRI was interpreted by the radiologist as showing degenerative disc changes without foraminal or central canal compromise and annular tears which could be "symptomatic." (Tr. 426).

admitted that there could be "residual discomfort" from the plaintiff's fractured right leg, from the lumbar degenerative changes, a knee problem, and ankle instability. (Id.).  Regarding the effect of a dynamic x-ray motion study of the cervical spine, Dr. Lorber stated that pain could be associated with instability, but "the basis for this so-called dynamic x-ray motion is not in the chart" and was "not part of the records." (Tr. 499).  Apparently the ME was questioning the basis for a statement in an office note by Dr. Kendall Hansen, an interventional pain specialist, who referred to the x-ray study and mentioned that it showed instability.  (Tr. 194).  However, the actual report of the study was included in the records (Tr. 261), suggesting that Dr. Lorber had overlooked it.  The ME was also asked about the plaintiff's allegation of lumbar radiculopathy and stated that if there was no evidence of a lesion producing compression on the nerve root, he might obtain an EMG and nerve conduction velocity test to obtain confirmation of the plaintiff's symptomology, although such a test by itself was not sufficient to definitively establish radiculopathy.  (Tr. 499-500). The plaintiff did have a nerve conduction velocity test of her lower extremities performed on March 18, 2008, shortly before the second hearing on April 24, 2008. The NCV was interpreted as showing a lumbar radiculopathy and motor-sensory neuropathy.  (Tr. 427).  It is not clear when this report was added to the plaintiff's file but it does not appear that the ME was aware of it.

The plaintiff objects to several aspects of Dr. Lorber's testimony, including what she considers to be an unsupported allegation that she was addicted to narcotics, the fact that the physician was very interested in long-distance trips she had undertaken without considering mitigating factors, and what she considers to be unfair criticism of Dr. Roberts.  The plaintiff focuses on Dr. Lorber's admission that there <u>was</u> an objective medical basis for finding that the plaintiff had a painful condition, and asserts that this admission supports limitations listed by the treating physicians, as well as a treating chiropractic source.  In view of the fact that at least two potentially significant pieces of evidence were possibly not considered by the VE, the court agrees with the plaintiff on the latter point.  If the opinion of a treating physician is to be discounted in favor of non-examiners, it is important for the non-examiner to have access to the entire record.  <u>Blakley v. Commissioner of Social Security</u>, 581 F.3d 399, 409 (6th Cir. 2009).

In addition, the plaintiff appears to be correct that the ALJ did not provide good reasons for discounting the opinion of Dr. Roberts that she could work only four hours a day.  The ALJ summarized his treatment notes, but did not mention any restrictions, again raising the possibility that they were simply overlooked.  The Sixth Circuit has indicated that this is grounds for a procedural remand.  <u>Bowen v. Commissioner of Social Security</u>, 478 F.3d 742, 748 (6th Cir. 2007).  The court is not persuaded by the plaintiff's arguments regarding the ALJ's interpretation of the

functional capacity assessment completed by Dr. Tcheng.  As previously noted, Dr. Tcheng allowed four hours of standing and walking and four hours of sitting in an eight-hour day.  (Tr. 400).  After a dispute at the second hearing on the issue of whether this meant that the plaintiff could work a total of eight or just four hours per day (Tr. 512-16), the plaintiff's attorney apparently obtained a letter from Dr. Tcheng to "clarify" her comments.  The letter states that Dr. Tcheng felt that Mrs. Leake could "sit and stand intermittently for a total of four hours a day, *not* eight hours a day" (emphasis in original).  The physician stated that she had "mistakenly implied" that her patient could work in a "regular work setting" which she had interpreted as including work around the house.  She was only capable of doing regular activities at home because she was on large doses of narcotics for pain control.  She did not feel that Mrs. Leake was employable outside the home.  (Tr. 430).  The ALJ was dubious about this letter because it was submitted after the VE had testified that the plaintiff could perform some work under the other restrictions and did not explain the reasons for limiting the plaintiff to this extent or reconcile it with statements in her treatment notes showing that the plaintiff's pain was reasonably well controlled.  (Tr. 21).  To the extent that the ALJ was dissatisfied with the physician's explanation, the plaintiff will have an opportunity to obtain a further clarifying statement from the physician on remand, if desired.  Regarding restrictions by a treating chiropractic source (Tr. 396-7), further discussion may be warranted under the provisions of

Social Security Ruling 06-03p in view of the fact that the chiropractor, like the medical sources, apparently found the plaintiff limited to less than full-time work.

The plaintiff argues that the ALJ did not consider the side effects of her prescribed medications. The ALJ commented that side effects had not been clearly documented in the treatment notes. (Tr. 21-2). It does not appear that the plaintiff made complaints regarding side effects to Dr. Tcheng, who was providing the medications. There was a reference to side effects of slow-release Morphine affecting the plaintiff's "mentation" in the notes of Dr. Roberts, however. (Tr. 239). This is another matter that may be addressed on remand.

Finally, the plaintiff argues that the ALJ failed to consider her non-severe neck pain and allegations of mental problems in combination with her severe lumbar spine impairment. One of the factors cited by the ALJ for discounting any mental limitations, even though an essentially uncontradicted consultative psychologist[2] had determined that the plaintiff would have a moderate impairment in her ability to relate to others, including fellow workers and supervisors (Tr. 320), was the citation of the plaintiff's failure to take psychotropic medication or seek treatment. (Tr. 17).

---

[2] The report by the psychologist, Dr. Laura Little, was reviewed by state agency psychologist, Dr. Ed Stodola. Dr. Stodola indicated that Mrs. Leake did not have a "severe" mental impairment, but also "assigned great [weight]" to Dr. Little's restrictions. (Tr. 323, 335). "Moderate" mental limitations are inconsistent with a finding of a "non-severe" mental impairment. <u>Simpson v. Commissioner of Social Security</u>, 344 Fed. Appx. 181, 2009 WL 2628355 (6th Cir. August. 27, 2009).

However, it is a poor practice to chastise an individual with a mental impairment for failing to diligently seek treatment.  Blankenship v. Bowen, 874 F.2d 1116, (6th Cir. 1989).  Accordingly, there is some merit to the plaintiff's contention.  The ALJ's discussion of the plaintiff's neck pain, however, appears to be adequate.  (Tr. 17).

The decision will be remanded for further consideration.

This the 9th day of June, 2010.

Signed By:

*G. Wix Unthank*

**United States Senior Judge**